# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| CARRIE S. WILLIS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 6:16-cv-03251-SRB |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF DECISION

On November 12, 2019, the Court commenced a two-day bench trial on Plaintiff Carrie S. Willis's claims based on the Federal Tort Claims Act, 28 U.S.C. § 1346, *et seq.* ("FTCA"). Pursuant to Federal Rule of Civil Procedure 52(a)(1), "In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately." The Court need not make specific findings on all facts but only "on the ultimate facts necessary to reach a decision." *Allied Van Lines, Inc. v. Small Bus. Admin.*, 667 F.2d 751, 753 (8th Cir. 1982) (citations omitted). "Findings are adequate if they afford a reviewing court a clear understanding of the basis of the trial court's decision." *Id.* (citations and internal quotation marks omitted).

### I. Findings of Fact

Based on the evidence presented at trial and the Court's credibility determinations of the witnesses who provided testimony, the Court makes the following fact findings:

### $1 Presidential Coin History

1. In 2007, the United States Treasury ("Treasury") began issuing $1 coins depicting deceased United States Presidents with the intended purpose of having the coins replace paper dollars.
2. The initial release of these $1 Presidential coins (George Washington through James Garfield) was done by the Treasury on a rolling basis between February 15, 2007, (George Washington) and November 17, 2011 (James Garfield).

3. The $1 Presidential coins from George Washington through James Garfield were intended for wide circulating production and accordingly were minted in large numbers ranging from a high of over 163 million George Washington coins to a low of over 36 million James Buchanan coins.
4. In all, over two billion $1 Presidential coins were produced by the United States Mint at facilities in Denver and Philadelphia between 2007 and 2011, using a production process that moved as quickly as possible for the purpose of getting the coins into circulation as United States currency.
5. The minting process involved taking a massive metal coil, feeding the coil into a blanking press to create coin-sized disks, placing the metal disks into a larger heater (running between 700° to 900° F.), feeding the annealed disks into "cleaning" and "upsetting" processes, and then running the disks into high-speed stamping and edge-lettering presses.
6. The $1 Presidential coins minted between 2007 and 2011 were produced with no particular care, were dumped into bins by the thousands, and shot into "ballistic" bags at ballistic speed causing a lot of friction to the surface of the coins.
7. Newly-minted coins were then placed into bags of 2,000 coins each.
8. A large portion of the $1 Presidential coins minted between 2007 and 2011 were then sent from the United States Mint to a third-party vendor, Coin Wrap, a commercial processor for wrapping, rolling, and boxing to be used in commerce as currency.
9. This wrapping, rolling, and boxing process subjected the surface to considerable friction impacting the circulating quality of the coins by using a vacuum to draw up coins into an industrial hopper and then dropping them into a wrapping process.
10. To commercially wrap the coins, the coins in each roll were compressed by machine and then wrapped in multiple thin layers of paper, making an extremely tight package. To unwrap the coins, a roll would have had to be cracked open with considerable force.
11. The wrap was also meant to be a security feature to ensure that any tampering with a roll would be evident because the roll would lose its structural integrity.
12. Following the wrapping of the coins, Coin Wrap placed 25 rolls of 40 $1 Presidential coins into boxes (sometimes referred to as "bricks") and sent them out to banks so as to permit individuals and businesses to directly order the $1 Presidential coins in these $1,000 bricks.
13. The distribution of $1 Presidential coins in bricks was done to help commercial retailers get the coins into circulation more quickly and cheaply, and not to identify the coins as collector's items.
14. The United States Mint has no "first strike" designation for coins. Moreover, the metal "dies" utilized by the United States Mint, which strike each side of a coin with artwork, wear out and are replaced at random times making it impossible to predict when a batch of coins might contain a coin struck by a brand-new die.
15. The $1 Presidential coins minted between 2007 and 2011 had no designation as to when produced, other than the name of the president and a "do not open until" the release date sticker on each box, making it impossible to tell when a coin was struck by looking at the box.
16. The $1 Presidential coins were not popular with the public and by 2011 were deemed by the Treasury to be unsuccessful.

17. Following the issuance of the James Garfield coins in 2011, the Treasury ended the circulating production of $1 Presidential coins.
18. Due to the unpopularity of the $1 Presidential coins, a surplus of over one billion unwanted coins remains in Federal Reserve terminals and in vaults under the United States Mint, including millions of coins never circulated in commerce, some in original boxes.
19. From the moment that they were minted through the present day, the $1 Presidential coins were and still are legal United States tender with a face value of $1 per coin.

### Seizure of the Willis $1 Presidential Coins

20. Between 2007 and 2011, Bobby Willis and Carrie Willis purchased $1 Presidential coins in 364 $1,000 bricks, obtaining coins depicting Presidents George Washington through James Garfield, with the following distribution:

| President | Quantity | President | Quantity |
|---|---|---|---|
| 2007 George Washington | 7,000 | 2009 James K. Polk | 20,000 |
| 2007 John Adams | 10,000 | 2009 Zachary Taylor | 20,000 |
| 2007 Thomas Jefferson | 10,000 | 2010 Millard Fillmore | 20,000 |
| 2007 James Madison | 10,000 | 2010 Franklin Pierce | 20,000 |
| 2008 James Monroe | 20,000 | 2010 James Buchanan | 20,000 |
| 2008 John Quincy Adams | 26,000 | 2010 Abraham Lincoln | 20,000 |
| 2008 Andrew Jackson | 26,000 | 2011 Andrew Johnson | 20,000 |
| 2008 Martin Van Buren | 20,000 | 2011 Ulysses S. Grant | 20,000 |
| 2009 William Henry Harrison | 20,000 | 2011 Rutherford B. Hayes | 20,000 |
| 2009 John Tyler | 20,000 | 2011 James Garfield | 15,000 |

21. Twenty-percent of the funds used to purchase the $1 Presidential coins came from the James and Norma Willis Trust, Bobby Willis's grandparents, and eighty-percent of the funds came from the Bobby L. and Carrie S. Willis Trust.
22. Bobby Willis and Carrie Willis divorced in early 2012.
23. As part of the divorce, Bobby Willis gave up any ownership interest in the $1 Presidential coins.
24. Bobby Willis was removed as a trustee and beneficiary of the Bobby L. and Carrie S. Willis Trust, leaving Carrie Willis as the lone trustee and beneficiary.
25. After Bobby and Carrie Willis's divorce, 20% of the $1 Presidential coins were owned by the James and Norma Willis Trust, and 80% of the $1 Presidential coins were owned by the Bobby L. and Carrie S. Willis Trust.
26. Plaintiff owned 80% of the $1 Presidential coins.
27. Prior to September 26, 2012, state and federal authorities in the State of New Mexico were actively investigating claims of financial fraud, including embezzlement and misappropriation of escrow money, involving the title company and escrow business previously operated by Bobby Willis and Carrie Willis.
28. In May 2012, Bobby Willis voluntarily and unilaterally came into the Springfield, Missouri IRS office to advise agents of his connection to a foreign drug cartel and to tell the agents he was under investigation in New Mexico for embezzlement.

29. According to the two IRS agents in Springfield, Missouri, who interviewed him, Bobby Willis told them, among other things, that:
    (a) he was under investigation by the Farmington (New Mexico) Police Department and the New Mexico Regulation and Licensing Dept. Financial Institutions Div.,
    (b) he was being asked by a "drug cartel" to negotiate counterfeit checks in amounts exceeding 750 million pesos,
    (c) he owned "jewel mines" and was selling precious stones to the "drug cartels," and
    (d) he was "worth a lot of money but [did] not make a lot of money."
    Ex. 117.
30. In August 2012, state law enforcement officers from New Mexico came to Missouri to execute search warrants at the Branson Underground, a storage facility used by Bobby Willis, based on a belief that they might find evidence related to allegations that Bobby Willis had embezzled substantial money from his title and escrow businesses.
31. On August 17, 2012, an IRS agent in Springfield, Missouri, prepared an Information Report Referral that stated the IRS had been contacted by an attorney who stated that his client had information concerning Bobby Willis's dealings in Branson, Missouri, and, on further investigation by the IRS agent, it was learned that Bobby Willis had "been indicted and an arrest warrant issued on suspicion of racketeering, fraud, embezzlement, and securities fraud" and that Willis had operated a title company in New Mexico that showed "escrow deficits of $1.6 million." Ex. 127.
32. In 2012, Scott Wells was employed as a Special Agent with the IRS, working out of the Springfield, Missouri office as a liaison with the Missouri Highway Patrol.
33. Prior to September 26, 2012, Agent Wells was aware that there were state and federal investigations of Bobby Willis in New Mexico, and Agent Wells was specifically aware of the contents of both the May 2012 report of interview and the August 2012 Information Referral Report.
34. On September 25, 2012, a state court judge in Taney County, Missouri, issued a search warrant to New Mexico state law enforcement authorities for several additional Missouri properties associated with Bobby Willis, including a residence at 822 Cliff Drive, Branson, Missouri, to search for papers and documents relative to the financial and business transactions of Bobby Willis in connection with allegations of fraud, embezzlement, and theft against Bobby Willis.
35. The search warrant was executed at 822 Cliff Drive on September 26, 2012, while Carrie Willis was in Rochester, Minnesota.
36. During execution of the search warrant in which several local and state law enforcement agencies participated, Missouri State Highway Patrol Trooper Dan Nash contacted Special Agent Scott Wells with the IRS.
37. Trooper Nash called to inform the IRS that, while executing the Search Warrant at 822 Cliff Drive, officers found multiple, large, black safes containing collectibles and 364,000 $1 Presidential coins that were boxed and packaged.
38. The Presidential coins were outside the scope of the search warrant.
39. Agent Wells contacted his supervisor at the IRS, Tonya Martin, who instructed Wells to contact Assistant United States Attorney ("AUSA") Cindy Hyde about whether the Presidential coins could be seized without a warrant.

40. Agent Wells told AUSA Hyde that the Highway Patrol executed a search warrant related to Bobby Willis and that there was a large amount of currency in the residence.
41. AUSA Hyde advised Agent Wells that she would contact the AUSA office in New Mexico.
42. AUSA Hyde called Agent Wells back and instructed Agent Wells that he could seize the Presidential coins.
43. Agent Wells seized the coins.
44. The IRS did not apply for a seizure warrant or fill out any affidavit explaining the need to seize the $1 Presidential coins.
45. Agent Wells did not document the reason for seizing the $1 Presidential coins, either before or after the seizure occurred.
46. At the time they were seized, the Presidential coins were in 364 boxes of 1,000 coins each.
47. Some of the boxes had been opened by Bobby Willis.
48. Each box of $1 Presidential coins that was sent to a bank for distribution had a sticker with the particular President's name and two stickers with a release date.
49. Agent Wells saw that the 364 boxes of $1 Presidential coins seized from 822 Cliff Drive also had stickers indicating from which bank they were purchased.
50. Agent Wells did not photograph any of the seized items.
51. The Missouri Highway Patrol took pictures of the stacked boxes of $1 Presidential coins, but no one took pictures of the stamps or markings on the boxes.
52. After the Presidential coins were seized, Special Agent Robert Jackson, who was then the Asset Forfeiture Coordinator ("AFC") for the Missouri IRS office, was contacted and travelled from Kansas City to take possession of the Presidential coins.
53. As the Asset Forfeiture Coordinator, Agent Jackson was responsible for assisting IRS agents by giving guidance, advice, and training to IRS agents and by processing assets that had been seized by the IRS.
54. On September 27, 2012, Agent Jackson traveled to Springfield, Missouri, to pick up the boxes of coins and other property.
55. On September 27, 2012, Agent Jackson had the Presidential coins transported to Dunbar Armored, Inc. in Kansas City, Missouri.
56. At Dunbar the Presidential coins were removed from their original packaging and processed through a coin counter.
57. Thereafter, $364,000 was deposited in an IRS account.
58. The boxes in which the 364,000 $1 Presidential coins were seized were destroyed.
59. Other items of property seized at the same time as the Presidential coins, including other collectible coins, gems, and paper money, were stored in an asset forfeiture safe.
60. No chain of custody documentation was created for the $1 Presidential coins or any of the other property stored in safes.
61. Agent Jackson did not conduct any analysis to determine whether the $1 Presidential coins had numismatic value.
62. On November 12, 2012, the IRS sent formal written notice to Bobby Willis that the IRS had seized property at the Branson residence.
63. On December 5, 2012, counsel for Plaintiff requested return of the assets.
64. In April 2015, different counsel for Plaintiff again sought return of the Presidential coins and other seized property.

65. On April 13, 2015, the IRS informed counsel that the Presidential coins had been "converted to cash and deposited into the government's account." Ex. 5-T.
66. Thereafter, the IRS wire transferred $364,000 to counsel's trust account.
67. Plaintiff's brother, Thomas Padilla, travelled to Kansas City to retrieve the other seized property.
68. After discovering that the Presidential coins had been deposited into circulation, Plaintiff filed an administrative tort claim with the Department of Treasury on August 17, 2015.

## IRS Policies

69. The Internal Revenue Manual ("IRM") states IRS agents should obtain judicial approval of a seizure other than in exceptional circumstances.
70. The IRM states that warrantless seizures "should only be made if the exigent circumstances prohibiting the timely obtainment of a seizure warrant can be clearly documented."
71. IRM policy 9.7.6.14.1(1) and IRM policy 9.7.4.6.1(2) include identical language, "Criminal Investigation policy mandates that domestic and foreign currency seized for forfeiture, except where it is to be used as evidence or held as a 'collectible asset,' must be expeditiously counted, processed, and deposited to the Customs Suspense Account within 5 days of seizure. The use of safe deposit boxes or other secure methods of storing seized currency temporarily is acceptable when necessary."

## Findings as to Damages

72. Although gold-colored, the $1 Presidential coins do not contain more than trace amounts of valuable metal and are worth no more than 11 cents per coin.
73. With regard to the value of the $1 Presidential coins as collector's items, the parties offered expert testimony from two witnesses: Mitchell Spivack, who testified as a damages expert for the United States, and Dane Olevian, M.D., who testified as a damages expert for Plaintiff.
74. Dr. Olevian opined that the value of the Willis collection based on PCGS pricing data was $7,264,220. Dr. Olevian further opined that certification costs given the size of the Willis collection could be negotiated for $500,000, resulting in a net valuation of $6,764,222.
75. The Greysheet is a monthly publication that lists the raw value of coins. Utilizing the Greysheet figures, Mr. Spivack's expert report found the value of the Willis collection to be $482,600. Mr. Spivack then reduced this figure based on his review of dealer-to-dealer transactions on the Certified Coin Exchange. Mr. Spivack ultimately concluded the value of the Willis collection as raw coins was between $391,200 and $412,400.
76. Mr. Spivack also conducted a certified coin analysis and found the net value was $96,743.10 due to screening and certification fees.

6

## II. Conclusions of Law

The claims and parties involved in this case have been narrowed during the course of the proceedings such that Plaintiff's Federal Torts Claims Act ("FTCA") claims for negligence and conversion against the United States were all that remained at trial. In her post-trial submission to the Court, however, Plaintiff abandoned her negligence claim and chose to submit only the conversion claim for the Court's consideration.[1] (Doc. #259).

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Generally, the FTCA provides the United States will be liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA also includes thirteen exceptions to the United States' waiver of sovereign immunity. 28 U.S.C. §§ 2680(a)-(f), (h)-(n). At issue in this case are the detained-goods exception and the discretionary-function exception.

Also at issue is this case is the FTCA statute of limitations. Title 28 U.S.C. § 2401(b) provides, "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing . . . of notice of final denial of the claim by the agency to which it was presented." Plaintiff presented her claim to the Department

---

[1] Irrespective of this abandonment, the Court finds Plaintiff failed to establish at trial the elements of a negligence claim under Missouri law.

of Treasury on August 17, 2015, so the claim must have accrued on or after August 17, 2013, to be timely filed.

### A. Conversion

The parties agree Missouri law applies to the underlying claim of conversion. Under Missouri law, "[p]roof of conversion can be shown in one of three ways: (1) by tortious taking; (2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner; (3) by a refusal to give up possession to an owner upon demand, *even though the defendant's original possession of the property was proper*." *Northland Ins. Co. v. Chet's Tow Serv., Inc.*, 804 S.W.2d 54, 56 (Mo. App. W.D. 1991) (citation omitted) (emphasis added). The Missouri Approved Instruction for a claim of conversion based on failure to surrender possession modified to fit the facts of this case provides:

> First, plaintiff was the owner of the 364,000 $1 Presidential coins, and
>
> Second, defendant had possession of the 364,000 $1 Presidential coins, and
>
> Third, plaintiff made a demand to defendant for possession of the 364,000 $1 Presidential coins, and
>
> Fourth, thereafter defendant intentionally failed to return possession of the 364,000 $1 Presidential coins to plaintiff.

M.A.I. 23.12(2).

The Court finds Plaintiff has established the elements of conversion for failure to surrender possession. The Court finds Plaintiff owned 80% of the $1 Presidential coins. Defendant seized and possessed the $1 Presidential coins. Plaintiff demanded the $1 Presidential coins be returned, and Defendant failed to return them.

Defendant argues probable cause existed to seize the coins, which insulates it from liability. The Court disagrees. As stated in *Northland Ins.*, liability for conversion can be found

even where a defendant's original possession was proper. 804 S.W.2d at 56. The Court need not decide whether probable cause existed to seize the $1 Presidential coins because Defendant was not entitled to retain possession of the $1 Presidential coins upon Plaintiff's demand for return. Defendant did not return the $1 Presidential coins to Plaintiff but instead gave Plaintiff a check for $364,000. As will be discussed more fully in the Damages section below, the Court finds this amount was less than the value of the $1 Presidential coins and did not adequately compensate Plaintiff for her loss of property.

### B. Detained-Goods Exception

Even though Plaintiff has proven the elements of a claim for conversion based on failure to surrender possession, Defendant is entitled to sovereign immunity and therefore insulated from liability if the detained-goods exception applies. The detained-goods exception preserves the United States' sovereign immunity over "[a]ny claim arising in respect of . . . the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer[.]" 28 U.S.C. § 2680(c). The FTCA further includes an exception to this exception, however, thereby re-waiving the United States' sovereign immunity "if—(1) the property was seized for the purpose of forfeiture under any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense; (2) the interest of the claimant was not forfeited; (3) the interest of the claimant was not remitted or mitigated (if the property was subject to forfeiture); and (4) the claimant was not convicted of a crime for which the interest of the claimant in the property was subject to forfeiture under a Federal criminal forfeiture law." 28 U.S.C. §§ 2680(c)(1)-(4).

The Court finds the exception to the exception applies in this case resulting in a waiver of sovereign immunity as to Plaintiff's claim. Even assuming that the property at issue must be

seized solely for the purpose of forfeiture in order for the exception to the exception to apply, *see Petrovic v. United States*, No. 4:16-cv-1744-SNLJ, 2017 WL 1058852, at *2 (E.D. Mo. Mar. 21, 2017), *aff'd*, No. 17-1717, 2017 WL 4844252 (8th Cir. Sept. 20, 2017), the Court finds the evidence presented at trial compels the factual conclusion that the 364,000 $1 Presidential coins were seized solely for forfeiture in this case.

Defendant's only argument against application of the exception to the exception found in 28 U.S.C. §§ 2680(c)(1)-(4) is that the $1 Presidential coins were seized for forfeiture, evidence of a crime, and potential restitution making the exception to the exception inapplicable. The Court finds the evidence does not support such a factual finding. No documentation was ever made of the reason for the seizure, either before *or after* the seizure was made, even though IRS policy required it. No chain of custody documentation was created. No pictures were taken of the individual boxes, which would have shown the stickers on the boxes and the condition of each box at the time of the seizure. Neither the coins nor the boxes in which they were stored were kept, which directly contradicts the assertion they were seized as evidence. Agent Jackson testified he considered the $1 Presidential coins to be currency without any consideration or analysis of their character as a collectible asset, and IRS policy requires that currency seized for forfeiture be expeditiously counted, processed, and deposited as was done here. Based on the weight and totality of all the evidence presented, the Court finds the $1 Presidential coins were seized solely for forfeiture. Sovereign immunity is, therefore, waived by 28 U.S.C. §§ 2680(c)(1)-(4).

### C. Discretionary-Function Exception

Defendant also argues the discretionary-function exception applies thereby preserving sovereign immunity as to Plaintiff's claim for conversion. Title 28 U.S.C. § 2680(a) excepts

from the FTCA's waiver of sovereign immunity "any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." "The discretionary-function exception precludes suit against the government for harm caused by a government employee's acts if those acts are subject to discretion that is grounded in social, economic, and political policy." *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (citation and internal quotation marks omitted).

Courts employ a two-step analysis to determine whether the discretionary-function exception applies. As stated by the Eighth Circuit in *Buckler*:

> First, we ask whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being controlled by mandatory statutes or regulations. . . . If the conduct or omission involves discretion, we next ask whether the government employee's judgment or choice was based on considerations of social, economic, and political policy. . . . Importantly, as long as a discretionary decision is susceptible to policy analysis, . . . the exception applies whether or not [a] defendant in fact engaged in conscious policy-balancing. . . . And, if qualifying discretion exists, the exception applies regardless of whether the government employee abuses that discretion. . . . Finally, if discretion exists, a presumption arises that the discretion is grounded in policy considerations, and the plaintiff must rebut this presumption.

919 F.3d at 1045-46 (citations and internal quotation marks omitted).

IRS policy is silent as to the difference between currency and collectible assets. Defendant argues this silence means Agent Jackson's actions were discretionary and, therefore, subject to the discretionary-function exception. The evidence at trial, however, shows Agent Jackson did not exercise any discretion in his actions. Agent Jackson performed no analysis regarding whether the $1 Presidential coins had numismatic value. He used no "judgment" and made no "choice" because he never even considered an alternative to the $1 Presidential coins

being currency. As stated in *Buckler,* "Based on Appley Brothers, therefore, we believe it is permissible, when analyzing the discretionary-function exception, to recognize that some duties are mandatory in that they must be performed *in some fashion*, even if the manner in which they are performed involves protected discretion." 919 F.3d at 1052. Having failed to perform his duty at all, Agent Jackson's actions do not fall within the discretionary-function exception.

### D. Statute of Limitations

An FTCA "claim 'accrues' when the plaintiff knows or reasonably should know of both the existence and cause of the injury." *Slaaten v. United States*, 990 F.2d 1083, 1041 (8th Cir. 1993) (citations omitted). The Court finds Plaintiff reasonably became aware of the existence and cause of the injury on April 13, 2015, the date she was informed the $1 Presidential coins had been "converted to cash and deposited into the government's account." Ex. 5-T. The Court finds Plaintiff's claim was filed within the statute of limitations.

### E. Damages

The Court finds the most credible evidence presented at trial as to the $1 Presidential coins' value came from Defendant's expert Michal Spivack based on the Greysheets, although the Court disagrees that the discounts Mr. Spivack applied to the Greysheet analysis are appropriate. Mr. Spivack's Greysheet analsyis resulted in a valuation of $482,600.00 for the entire Willis collection. (Ex. 143, p. 7). The discounts Mr. Spivack applied to this figure based on CCE transactions are rejected by the Court. Defendant returned $364,000 resulting in a balance of $118,600. The Court finds the damages owed to Plaintiff are 80% of the balance not paid out by the Government, or $94,880.00.

### III. Conclusion

Based on the foregoing, the Court hereby directs the Clerk of the Court to enter Judgment in favor of Plaintiff Carrie S. Willis in the amount of $94,880.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT COURT

DATE: March 23, 2020